**PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY, Appellee,**

v.

**UNITED STATES of America, Appellant,**

**Inland Power & Light Co., Respondent.**

**No. 23539.**

United States Court of Appeals Ninth Circuit.

Sept. 17, 1969.

William G. Ennis (argued), of Ennis & Klobucher, Spokane Wash., for appellee.

Roger P. Marquis (argued), Glen E. Taylor, Acting Asst. Atty. Gen., Washington, D. C., Smithmoore P. Myers, U. S. Atty., Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for appellant.

Will Lorenz (argued), of Trezona, Chastek & Lorenz, Spokane, Wash., for respondent.

Before ELY and CARTER, Circuit Judges, and SMITH,* District Judge.

RUSSELL E. SMITH, District Judge.

Public Utility District No. 1 of Pend Oreille County (PUD) is a municipal corporation. Inland Power & Light Co. (Inland) is a private non-profit membership corporation. Both are organized under the laws of Washington. Inland furnished electrical energy to its members in ten counties in Washington, including Pend Oreille County, and two counties in Idaho. It is and has been financed by the Rural Electrification Administration[1] and has mortgaged all of its assets to the Administration. PUD seeks to acquire the facilities of Inland in Pend Oreille County.

Federal law provides that a borrower of funds from the Administration may not sell or dispose of its property without the consent of the Administrator.[2] Inland has refused to sell and the Administrator refused to consent and both oppose the condemnation. The District Court upheld the right to condemn and this appeal followed. We reverse.

---

* Honorable Russell E. Smith, United States District Judge, District of Montana, sitting by designation.

1. 7 U.S.C. § 901 et seq.

2. "No borrower of funds under sections 904 or 922 of this title shall, without the approval of the Administrator, sell or dispose of its property, rights, or franchises, acquired under the provisions of this chapter, until any loan obtained from the Rural Electrification Administration, including all interest and charges, shall have been repaid." 7 U.S.C. § 907.

Under the law of Washington a public utility district may condemn any facilities for the generation or distribution of electrical energy [3] even though those facilities are already devoted to a public use. The commissioners of the PUD by resolution determine the necessity for the taking and that determination is conclusive unless it can be shown that the commissioners acted fraudulently or capriciously. The law under which a PUD condemns does not provide for any factual consideration of the problem of public use or any weighing of the needs of the condemning PUD as against the needs of the condemnee. The public character of its ownership is deemed to make the use of the condemning PUD a higher use than that of the privately owned electric company.[4]

In 1936 Congress, concerned with the fact that those then engaged in the business of generating electrical energy had failed to extend electric service to the farms of America,[5] created the Rural Electrification Administration.[6] The Administrator was authorized to make low interest loans for rural electrification and to study the condition and program of electrification in rural areas.[7]

Congress determined that the national interest would be served by subsidizing the rural user of electricity. The federal purpose to electrify rural America was largely accomplished by 1955, by which time 93% of the farms were electrified.[8] The continuing congressional interest in the electrification of the farms is indicated by the deliberate retention in 1955 of the requirement

that the Administrator make a yearly unelectrified farm survey.[9] True, the United States, when the loan is paid, no longer has the same direct interest in the borrowing distributor, but so long as the United States is interested in keeping the electric lamps lit on the farms, it is of necessity interested in the vehicles distributing the electricity which will light those lamps.

In an ordinary condemnation case the condemnee loses something of value but is paid for it. This is not an ordinary case because what is sought to be taken here is part of a system and even if the part taken is paid for, and if an award is made for the damage to the remaining portion, a question remains as to the capacity of the remaining portions of the system to function. As we understand the law of Washington, the capacity of a condemnee to continue to function as a healthy economic unit is not relevant to the issue of the taking. In this case if, as a result of the condemnation, the loans to Inland were paid in full, but the remaining portions of the system could not continue to operate with decent service and at decent rates, the Government would have been paid but the purpose of the Rural Electrification Act would have been frustrated.

The problem then comes down to this: May a part of the distribution system of a federally subsidized distributor of electricity be taken under a law which looks only to the necessity of the taker, which vests in the taker the right to determine the necessity, and which makes no requirement that an underlying fed-

3.  R.C.W.A. § 54.16.020.

4.  State ex rel. Washington Water Power Co. v. Superior Court for Douglas County, 8 Wash.2d 122, 111 P.2d 577 (1941) ; Carstens v. Public Utility Dist. No. 1, 8 Wash.2d 136, 111 P.2d 583 (1941), cert. den. 314 U.S. 667, 62 S.Ct. 128, 86 L.Ed. 533 (1941) ; Puget Sound Power & Light Co. v. Public Utility District No. 1, 123 F.2d 286 (9 Cir. 1941).

5.  House hearings on S. 3483, 74th Cong., 2nd Sess., March 12, 1936. It was re-ported that 85% of the farms in America were without electricity.

6.  7 U.S.C. § 901.

7.  7 U.S.C. § 903.

8.  Senate Report No. 209, U.S.Code, Cong. & Adm.News, 84th Cong., First Session Vol. 2, page 2041 (1955).

9.  7 U.S.C. § 903(c).

eral purpose be considered? We think not.

There is no case law exactly in point. In a predecessor case, Public Utility Dist. No. 1 v. Inland Power & Light Co., 64 Wash.2d 122, 390 P.2d 690 (1964), the Supreme Court of Washington, in holding that the United States was an indispensable party to this kind of a condemnation suit, noted the substantial interest of the United States in the Inland properties. In City of Fairbanks v. Electric Distribution System (Alaska), 413 P.2d 165 (1966) the Supreme Court of Alaska, in considering the indispensability of the United States as a party, noted the interest of the United States in the continued functioning of an REA subsidized distributor and the possibility that a condemnation of a part of the system might damage the capacity of the condemnee to continue. In Alabama Power Company v. Alabama Electric Cooperative, Inc. et al., 394 F.2d 672 (5 Cir. 1968) cert. den. 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968), the Court of Appeals for the Fifth Circuit, in holding an REA Cooperative exempt from the anti-trust laws, said:

"The Power Company would treat REA simply as a rival public utility. We agree with the recent decision of the Federal Power Commission in Dairyland Power Cooperative, 37 F.P. C. 12, 35 L.W. 2385, that rural electric cooperatives are something more than public utilities; they are instrumentalities of the United States. They were chosen by Congress for the purpose of bringing abundant, low cost electric energy to rural America.'" Alabama Power, supra, at 677.

Later the Court of Appeals for the District of Columbia, in City of Paris, Kentucky, v. Federal Power Commission, 130 U.S.App.D.C. 250, 399 F.2d 983 (1968), held that a rural electric cooperative was not an "instrumentality of the United States", within the meaning of certain exemptions in the Federal Power Act.

Were the word "instrumentality" used in some relevant act of Congress, we might be required to determine the character of Inland, but since it is not we do not believe it will assist in solving the problem to characterize Inland by the use or nonuse of the word "instrumentality." We prefer to look at the case in terms of the federal purpose involved and the possible effect of the state law upon that purpose.

Congress has declared the federal purpose to electrify the American farm. No matter how we characterize the vehicle which gets the electricity there, a state law so written that a state-favored utility can by its unilateral action interfere with the federal purpose can not stand under the supremacy clause of the constitution of the United States.[10]

The case of Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U.S. 1, 24 L.Ed. 708 (1877), is illustrative of the application of the supremacy doctrine. Congress passed "An Act in aid of the construction of telegraph lines and to secure to the government the use of the same for postal, military and other purposes." The Act subsidized private telegraph companies which accepted the benefits and burdens of the Act by permitting free use of federal lands, rights of way, and materials from the public land. The Act provided a priority of right in the United States to the use of telegraphic facilities at rates to be fixed by the Postmaster General. Western Union Telegraph Company, a New York corporation, accepted the provisions of the federal law. The Florida legislature granted the Pensacola Telegraph Company the exclusive right to establish telegraph lines in two Florida counties. The court held that the exclusive right granted by Florida law could not diminish the rights of Western Union Telegraph Company. True, the connections with interstate commerce were clearer and the interest of the United States more direct in the cited case than in the one which we decide,

10. U.S.Const. Art. 6, clause 2.

but the cases are comparable in that in both it is a private corporation which serves the federal purpose and it is a state law which would frustrate that purpose.

To avoid any interpretations of this opinion which would carry it beyond what is intended, it is noted that we have considered a condemnation case in which a part of a system, including customers, would be taken; we infer nothing as to the rule in the case of the taking of a building or other replaceable property. We treat here of a state statute which, as a matter of law, and without regard to factual necessities makes the use of a condemning state corporation a higher use than the use of a corporation which is or has been federally subsidized to serve a federal purpose. We infer nothing as to the rule to be applied in a case where under governing state law it could be made to appear as a matter of fact that the taking for state purposes would not interfere with the federal purpose.

The judgment is reversed with directions to dismiss the action.